**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DEBRA DAVIS, on behalf of herself and** | : | **CIVIL ACTION** |
| **all other similarly situated persons** | : | |
| | : | |
| **v.** | : | **NO. 03-6060** |
| | : | |
| **KRAFT FOODS NORTH AMERICA** | : | |

Diamond, J.                                                      **January 31, 2006**

## MEMORANDUM

Debra Davis charges that Kraft Foods has discriminated against African-American employees with respect to job discipline and classification.  42 U.S.C. §§ 2000e, et seq.; 42 U.S.C. § 1981.  Ms. Davis asks me to certify a class of all African-American hourly employees who worked in Kraft's Philadelphia Bakery at any time from November 3, 1999 to the present. Kraft responds that Ms. Davis failed to exhaust her administrative remedies with respect to the Title VII class claims.  Kraft also argues that Ms. Davis cannot bring a class claim under Title VII or § 1981 because she does not meet the commonality, typicality, and adequacy requirements for class certification.

I agree with Kraft in part.  Although it is a close question, I do not agree that Ms. Davis failed to exhaust her administrative remedies with respect to her Title VII class claims.  I agree with Kraft, however, that Ms. Davis cannot meet the law's typicality requirements with respect to her job classification claims, and so deny certification of those claims with prejudice.  As to the claims of discriminatory discipline, I deny class certification without prejudice so that Davis may obtain new counsel.

Finally, Kraft has moved to strike the report of Plaintiff's expert. I deny the motion

-1-

without prejudice to the extent that it relates to disciplinary issues, and deny the remainder of the motion as moot.

## BACKGROUND

### I. Davis's Class Allegations

#### A. Job Classification

Nabisco operated a bakery in the Northeast section of Philadelphia until December 2000, when Kraft acquired Nabisco, assuming all Nabisco's assets and liabilities.  (Pl. Ex. 6, Phillip Morris Cos., Inc. Form 10 K, dated December 31, 2000, at 12, Pro Forma Condensed Combined Balance Sheet).  The Philadelphia Bakery makes cookies and crackers.

From November 1999 to the present, the Philadelphia Bakery has employed some 450 to 600 hourly workers and 60 to 70 salaried employees.  (Pl. Ex. 8, Savoy Dep. at 63; Pl. Ex. 9, Beitzel Dep. at 91; Pl. Ex. 5, Phila. Bakery Supervisory Guidelines Handbook at 4). Approximately half the hourly workforce is African-American.  (Pl. Ex. 8, Dep. of Savoy at 64). The hourly workers are represented by the Bakery, Confectionary and Tobacco Workers' International Union AFL-CIO Local 492, which has negotiated a Collective Bargaining Agreement with Kraft. (Def. Memo. of Law in Opp. to Class Cert. and in Support of Mot. to Strike Pl.'s Expert Rep., p. 3).

The Bakery has seven departments comprised of skilled and semi-skilled positions.  (Pl. Ex. 2, 2001-2004 Collect. Barg. Agmt. at p. 28; Pl. Ex. 9, Beitzel Dep. at 202-203).  Plaintiff alleges that African-Americans are under-represented in the Bakery's higher paying skilled jobs. See Pl. Ex. 4, Expert Report of David L. Crawford, Ph.D., at ¶ 19.

Davis also alleges that Kraft discriminates against African-American employees in the

assignment of entry-level positions.  Labor Schedulers – who are salaried supervisors – make job assignment decisions at the Bakery.  All new hourly employees are hired as trainees.  (Pl. Ex. 11, Doyle Dep. at 275).  Plaintiff alleges that after the training period, Labor Schedulers have discretion in assigning new hires to one of two permanent entry level hourly positions: "General Help" or "Floor Help."  (Id. at 319-320, 324).  "General Help" is the lowest paid level of Bakery work; "Floor Help" employees receive higher pay and other advantages, such as preference in the assignment of overtime work.  (Pl. Ex. 2, 2001-2004 Collect. Barg. Agmt. at 28, Appendix D; Pl. Ex. 12, Matthews Dep. at 115).  Plaintiff alleges that nonminorities were assigned to the "Floor Help" category more frequently than minorities.  (Pl. Ex. 12, Matthews Dep. at 115-117).

　　Job classifications at the Bakery are determined on a seniority-based bidding process. (Pl. Ex. 9, Beitzel Dep. at 210; Pl. Ex. 2, 2001-2004 Collect. Barg. Agmt. at p. 3, Article 5). Each hourly employee has plant-wide seniority based on the date of hire, as well as seniority within his or her department classification.  (Pl. Ex. 11, Doyle Dep. at 156-158).  The Collective Bargaining Agreement states that, "[t]he ability of candidates being equal, the senior employee shall be given preference" in filling job vacancies.  (Pl. Ex. 2, 2001-2004 Collect. Barg. Agmt. at p. 3, Article 5, Section 3).  The Agreement thus requires Kraft to fill both permanent and temporary vacancies on the basis of seniority.  (Pl. Ex. 11, Doyle Dep. at 166-69, 178-79, 184.) Plaintiff alleges that Kraft management nonetheless retains discretion in assigning employees to temporary vacancies.  (Pl. Mem. in Support of her Motion for Partial Summ. Judg. at p. 8-9). Many of these temporary positions become permanent assignments, with the potential for higher pay.  (Pl. Ex. 11, Doyle Dep. at 222; Pl. Ex. 10, Campbell Dep. at 288-289, Pl. Ex. 2, Collect. Barg. Agmt. at p. 11-12, Article 24).  Plaintiff alleges that Kraft placed more nonminorities in

temporary vacancies that became permanent positions, circumventing the bidding process required by the Agreement.

### B. Kraft's Disciplinary System

Under the Collective Bargaining Agreement, the "full power of employee discipline and discharge lies with the Company."  Kraft maintains a "progressive discipline policy" with respect to hourly employees, as explained in the Bakery's Supervisory Guidelines Handbook.  Under this policy, infractions are deemed either major or minor.  (Pl. Ex. 5, Phila. Bakery Supervisory Guidelines Handbook at 19).  Major infractions include "fighting, threatening bodily injury, using abusive, threatening language or exhibiting any type of harassment towards fellow employees or management."  (Id. at 18).  Minor infractions include tardiness and absenteeism. (Pl. Ex. 10, Campbell Dep. at 213-214). An employee committing a major infraction is subject to immediate suspension pending investigation or discharge.  (Id. at 19).  An employee committing a minor infraction is subject to five levels of discipline: 1) counseling; 2) verbal warning; 3) written warning; 4) disciplinary suspension; 5) suspension pending investigation or discharge. (Id. at 19-20).  Supervisors decide levels of discipline up through suspension, and provide discipline-related coaching, counseling, and warnings.  (Pl. Ex. 10, Campbell Dep. at 208-209; Pl. Ex. 13, Wojakowski Dep. at 66).

Kraft's Human Resources Department usually becomes involved in the discipline process when a suspension is warranted.  (Pl. Ex. 10, Campbell Dep. at 215).  Kraft's department heads – and sometimes the Plant Manager – also become involved if termination is considered.  (Id. at 217-18).  Kraft maintains "zero tolerance" of harassment in the workplace.  (Id. at 155). Supervisors and managers have the discretion to impose a range of discipline when an employee

violates the "zero tolerance" policy.  (Id. at 179-80; Pl. Ex. 13, Wojakowski Dep. at 55-56; Pl. Ex. 8, Savoy Dep. at 183-84).

An hourly employee may challenge any disciplinary measure by filing a Union grievance, which the employee may appeal through several levels of review: 1) the employee's immediate supervisor; 2) the department head; 3) the HR Manager; 4) the Plant Manager; and 5) Kraft's representative from outside the Philadelphia Bakery.  (Pl. Ex. 2, 2001-2004 Collect. Barg. Agmt. at 14, Article 31; Pl. Ex. 11, Doyle Dep. at 37, 42, 46).  Once the employee has gone through these levels of review, the Union may pursue the grievance to arbitration.  Managers and supervisors have significant discretion in deciding grievances at the first and second levels.  (Pl. Ex. 11, Doyle Dep. at 37; Pl. Ex. 13, Wojakowski Dep. at 34-35).

Ms. Davis's expert witness examined Kraft's Human Resources Database and concluded that: 1) sanctions were more likely to be assessed against African-American employees, and 2) the most severe disciplinary sanction – termination – was invoked more frequently against African-Americans.  (Pl. Ex. 4, Expert Report of Dr. David L. Crawford, Ph.D. at ¶¶ 25, 26).

## II. Allegations Relating to Kraft's Treatment of Plaintiff

Nabisco hired Ms. Davis on August 12, 1997.  (Complaint ¶30).  After completing an initial training period, she worked as a machine operator.  (Def. Ex. F, Dep. of Debra Davis, p. 35-38).  Her initial hourly compensation was $11.30.  (Def. Ex. C, Coll. Barg. Agmt. 1996-2001).  Having received regular raises, she earned $18.94 an hour at the time of her 2002 termination.  (Def. Ex. C, Coll. Barg. Agmt. 2001-2004).  During her nearly five-year tenure at the Bakery, she continued as a machine operator and never bid on any other job. (Def. Ex. F, Dep. of Debra Davis, p. 89-90).

On March 15, 2002, Bakery worker Veronica Naulty wore a green shirt to celebrate St. Patrick's Day.  (Id. at p. 139-145; 167-170).  Ms. Davis complained that Naulty, a Caucasian, was not wearing the required Kraft uniform.  (Id. at p. 139-145).  Naulty's supervisor directed her to change into her uniform. (Id. at p.145).  Naulty complained about the incident, prompting further investigation.  (Id. at p. 150-152).

At the conclusion of the March 15th shift, there was a two-week layoff of all Bakery production workers.  (Id. at p. 165-166; Def. Ex. A, Dep. of Kelly Wojakowski at p. 97-98).  Ms. Naulty, Ms. Davis, and other production workers returned to the Bakery on April 1st.  (Def. Ex. F, Dep. of Debra Davis, p. 165-166).  That evening, Naulty alleged that while she was in the women's locker room, someone stabbed her.  (Def. Ex. G, Investigation Notes p. 1-2). She reported to the nurse's station with back lacerations and a ripped shirt, but could not identify the perpetrator.  (Id.)  Kraft immediately investigated the incident.  (Id.)  After interviewing several Bakery workers, Kraft suspended three African-American employees without pay pending further investigation: Angela Price, Tracy Dunston, and Ms. Davis.  (Def. Ex. A, Dep. of Kelly Wojakowski at p. 211-215).

During the Naulty investigation, Kraft learned that on the evening of March 15th, African-American employee Eric Gray defended Naulty to Ms. Davis.  (Id. at p. 185-189). According to Mr. Gray and another employee, Ms. Davis responded by calling Mr. Gray "a faggot, a sellout, an Uncle Tom, a Nazi."  (Def. Ex. Q, Dep. of Sondra Dean I, p. 196-199).  Ms. Davis has consistently denied making these comments to Mr. Gray.

Kraft never determined who had assaulted Ms. Naulty.  (Def. Ex. A, Dep. of Kelly Wojakowski, p. 208-210).  Consequently, Kraft permitted both Ms. Price and Ms. Dunston to

return to work with back pay.  (Id. at 211-215).  Kraft concluded that Ms. Davis's alleged

statement to Eric Gray, however, had violated its "zero tolerance" anti-harassment policy, and

terminated her employment.  (Def. Ex. C, June 11, 2002 letter and Def. Ex. B, July 1, 2002

letter).  Ms. Davis unsuccessfully challenged both her suspension and termination through the

five-step internal grievance process. (Def. Ex. F, Dep. of Debra Davis at p. 105-106; Def. Ex. I,

August 29, 2002 letter and October 29, 2002 letter from Carolyn Binder to Debra Davis).  The

Union declined to pursue arbitration.  (Id.)

     Plaintiff alleges that Caucasian employees accused of engaging in conduct no less

offensive than her alleged remarks to Eric Gray went undisciplined, or received less severe

sanctions than termination.  (See, e.g., Pl. Ex. 9, Beitzel Dep. at 281, 310).

## DISCUSSION

### I. Plaintiff's Title VII Class Claims Are Not Procedurally Barred

     Kraft contends that I should deny class certification under Title VII because Davis did not

file a charge of class-wide discrimination with the Equal Employment Opportunity Commission.

I disagree.

     As a threshold matter, Ms. Davis contends that Kraft waived its administrative exhaustion

argument by failing explicitly to include it as an affirmative defense in its Answer.  The record

shows that exactly the opposite is true: Kraft's Affirmative Defense No. 8 states, "Ms. Davis and

the other allegedly similarly situated employees have failed to exhaust their administrative

remedies." (Def. Answer and Affirmative Defenses, p. 10).  Accordingly, I conclude that Kraft

has preserved the argument, whose merits I now evaluate.

     Title VII requires that claimants exhaust their administrative remedies before they may

proceed in federal court.  <u>Williams v. Runyon</u>, 130 F.3d 568, 573 (3d Cir. 1997).  Thus, a Title

VII plaintiff must first file a discrimination charge with the EEOC, which may issue a "right to

sue" letter if it cannot resolve the matter in 180 days.  42 U.S.C. § 2000e-5(e)(1), (f)(1).  The

scope of any ensuing federal lawsuit is limited by the "scope of the EEOC investigation which

can reasonably be expected to grow out of the charge of discrimination."  <u>Hicks v. ABT Assoc.,

Inc.</u>, 572 F.2d 960, 966 (3d Cir. 1978) (internal citations omitted).

On April 9, 2002, Ms. Davis, acting *pro se*, filed dual charges with the Philadelphia

Commission on Human Relations and the EEOC, alleging that Kraft discriminated against her

when it suspended her without pay pending the outcome of the Naulty investigation.  (Def. Sur-

Reply Brief, Ex. C, Letter from Stephen A. Whinston, Esq. to Marguerite S. Walsh, Esq., July 8,

2005).  She filed a second charge with the PCHR and EEOC on June 19, 2002, alleging

discrimination related to her termination.  <u>Id.</u>  It appears that these submissions relate exclusively

to Ms. Davis's individual claims of discrimination.

On December 9, 2002, Ms. Davis sent a letter to her PCHR investigator, in which she

compared her discipline to the discipline imposed on Caucasian employees:

> These documents will exhibit the same behavior that I was accused of and was
> terminated for . . . .  None of these employees were terminated who was involved.
> Here I am being terminated for allegely [sic] doing the same thing that these
> people were found to have done.  *The company has a history of being inconsistent
> and unfair with how they handle disciplinary actions with minorities and the
> severity of the actions taken against minorities*.

(Pl. Corrected Reply Mem., Ex. A, Letter from Debra Davis to Mr. Cowell, Dec. 9, 2002, p. 1)

(emphasis added).  With her December 9th letter, Ms. Davis submitted "documentation of cases

involving employees of Kraft/Nabisco Philadelphia Bakery."  (<u>Id.</u>)  Ms. Davis included in these

papers her own handwritten descriptions of Kraft's allegedly discriminatory acts against other

minority employees, including the following:

> I ask that you view the time frames on time frame [sic] on minorities cases.
> Notes: *There are discrepancies in the way minorities are being disciplined and
> the severity of the disciplinary actions.  Although some of these findings dates*
> [sic] *back to 1999 they are still in existing* [sic] *today.*

> (Id. at p. 10) (emphasis added).

Apparently conceding that her April and June EEOC submissions did not contain class-

based allegations, Ms. Davis argues that I should construe her December 9th submission as

amending her original EEOC charge to add a class claim.  Federal regulations provide that EEOC

charges may be amended to "clarify and amplify allegations made therein." 29 C.F.R. §

1601.12(5)(b).  The Third Circuit has held that, "[o]nce the charging party has done all that he

can reasonably do to amend his charge in accordance with the Commission's regulations, the

statutory policy of providing the EEOC with an opportunity to reconcile the grievance has been

fulfilled." Hicks, 572 F.2d at 964.  Although the Third Circuit has not yet addressed the question

of what submissions to the EEOC constitute amendments, other courts have liberally construed

letters and related documents sent to the EEOC as amending the original charges.  See, e.g.,

Atkinson v. Washington International Ins. Co., 1995 U.S. Dist. LEXIS 1865, at *25-27 (N.D. Ill.

Feb. 14, 1995) (holding that a detailed letter with various exhibits submitted by the claimant to

the EEOC and containing a new allegation of constructive discharge was tantamount to a request

for an amended charge).  This is particularly true where the plaintiff was acting *pro se* during the

administrative proceedings.  See Jenson v. Eveleth Taconite Co., 139 F.R.D. 657, 666 (D. Minn.

1991) (allowing as an amendment class based allegations made four years after the complainant's

initial *pro se* charge).  Here, Ms. Davis was proceeding *pro se* when she made the December 9th

submission to the PCHR.  In these circumstances, I believe that submission amended her original

EEOC charge.

I must next consider whether the allegations in the December amendment are sufficient to

allege class-based claims.  In Lusardi v. Lechner, the Third Circuit underscored that a plaintiff

may make class allegations even though she does not use the actual words "class action" in her

EEOC charge.  855 F.2d 1062, 1078 (3d Cir. 1988).  This is in keeping with the great weight of

authority that plaintiffs may proceed in federal court both as to those claims explicitly contained

in or "reasonably related" to their EEOC charges.  Jenkins v. Blue Cross Mut. Hospital Ins., Inc.,

538 F.2d 164, 167 (7th Cir. 1976); Danner v. Phillips Petroleum Co., 447 F.2d 159, 162 (5th Cir.

1971); Money v. Provident Mutual Life Co., 2004 U.S. Dist. LEXIS 10530, at *5 (E.D. Pa. June

3, 2004).  Once again, a claim is reasonably related if the conduct complained of "would fall

within the scope of the EEOC investigation which can reasonably be expected to grow out of the

charge of discrimination."  Hicks, 572 F.2d at 966 (3d Cir. 1978) (internal citations omitted).

Accordingly, a plaintiff may prosecute a class claim of discrimination in district court only if the

court determines that the class claim could reasonably have been expected to grow out of the

discrimination charge filed with the EEOC.  See Id. (plaintiff could prosecute his claims of sex

discrimination only if that claim could have grown out of his original discrimination charge).  In

making this determination, the court must examine: 1) whether the disputed claim would have

been discovered by the EEOC in the course of a reasonable investigation, and 2) whether the

claim "which would have been uncovered [was] reasonably within the scope of the charge filed

with the EEOC."  Id. at 967.

In her December 9th submission, Ms. Davis, acting *pro se*, plainly was trying to alert the EEOC to her belief that Kraft had a history of discriminatory discipline with respect to minorities.  In these circumstances, "the scope of [Ms. Davis's] . . . complaint could include class allegations since EEOC investigation of class discrimination against [minorities] could reasonably be expected to grow out of her allegations . . . ."  Fellows v. Universal Restaurants, Inc., 701 F.2d 447, 451 (5th Cir.).  See also Paige v. California, 102 F.3d 1035 (9th Cir. 1996) (allegations of racial discrimination in a state examination process necessarily would have required the EEOC to investigate potential class-based discrimination in that process).  Accordingly, I conclude that an EEOC investigation respecting discrimination against African-Americans as a class could reasonably be expected to have grown out of the discrimination charges brought by Ms. Davis.

Kraft argues that even if Ms. Davis's December 9th submission amended her EEOC charge to include class-based claims, she may not now bring those claims because Kraft did not receive notice of them until after she filed the instant lawsuit.  (Trans. of Sept. 8, 2005 Oral Arg. at 19).  Yet, the Third Circuit has held that a plaintiff will be deemed to have exhausted her administrative remedies "even where the EEOC has failed to give defendant notice of the charge or has failed to attempt to reconcile the parties either because of administrative failure or because of its finding of no cause."  Hicks, 572 F.2d at 966.  Kraft correctly observes that in Lusardi v. Lechner, the Third Circuit stressed that an EEOC charge should place the defendant on notice of class-based allegations. 855 F.2d at 1078.  I do not believe, however, that the Lusardi Court intended to penalize a civil rights plaintiff for the EEOC's failure to notify a defendant of class-based allegations.  This is particularly true where, as here, the plaintiff acted *pro se* before the

EEOC.  See Gamble v. Birmingham Southern Railroad Co., 514 F.2d 678, 688-689 (5th Cir.

1975) (Title VII's notice and conciliation requirements must yield to its more basic purpose – to

protect persons against employment discrimination).

     In sum, I find that Ms. Davis's class claim falls within the scope of the EEOC

investigation that could reasonably have been expected to grow out of her charge of

discrimination.  I thus reject Kraft's administrative exhaustion argument.

     Kraft next argues that Ms. Davis cannot bring Title VII class claims on behalf of those

persons who themselves were time-barred from proceeding before the EEOC when Ms. Davis

first brought her administrative charge. See Wetzel v. Liberty Mutual Life Ins. Co., 508 F.2d 239,

246 (3d Cir. 1975).  Title VII bars any administrative claim brought more than 300 days after the

claim arose.  See 42 U.S.C. § 2000e-5(e)(1) (imposing a 300-day limit where proceedings are

instituted before a state or local agency).  Here, Ms. Davis filed her discrimination charge with

the PCHR on April 9, 2002.  Accordingly, it appears that those putative class members whose

claims of discrimination arose before June 14, 2001, cannot be included in any proposed Title

VII class.

## II. Certification of Plaintiff's Title VII and § 1981 Claims

     To certify the proposed class, I must conclude that Plaintiff has satisfied all the

prerequisites of Fed. R. Civ. P. 23(a), and fulfilled at least one of the requirements of Rule 23(b).

See Georgine v. Amchem Products, Inc., 83 F.3d 610, 624 (3d Cir. 1996), aff'd, 521 U.S. 591,

117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); Nelson v. Astra Merck, Inc., 1998 U.S. Dist. LEXIS

16599, at *2 (E.D. Pa. Oct. 21, 1998).  Rule 23(a)'s threshold requirements are typicality,

adequacy, numerosity, and commonality.  Fed. R. Civ. P. 23(a).  Ms. Davis seeks certification

pursuant to Rule 23(b)(2), under which a class action may be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." Fed. R. Civ. P. 23(b)(2). Ms. Davis has the burden to show that the class should be certified. See Freedman v. Arista Records, 137 F.R.D. 225, 227 (E.D. Pa. 1991) (citing Davis v. Romney, 490 F.2d 1360, 1366 (3d Cir. 1974)).

In determining whether to certify, I must accept as true all substantive allegations in the Complaint. See Blacki v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S. Ct. 57, 50 L. Ed. 2d 75 (1976); see also Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 209 (E.D. Pa. 2000); Steward v. Associates Consumer Discount Co., 183 F.R.D. 189, 193 (E.D. Pa. 1998). I may look beyond the four corners of the Complaint for purposes of class certification, but I may not consider "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974) (internal quotations omitted).

## A. Typicality

Ms. Davis seeks to represent a class of African-American hourly employees at the Bakery against whom Kraft discriminated, "particularly in the areas of job classification and discipline." (Pl. Mem. of Law in Supp. of Mot. for Partial Class Cert. at p. 1). Kraft contends, *inter alia*, that she cannot meet Rule 23's typicality requirements with respect to her job classification claims.

To determine typicality, I must examine whether "the named plaintiff '[s] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based."

-13-

Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985) (internal quotations omitted).  The Third

Circuit has cautioned that "Rule 23 does not require that the representative plaintiff have endured

precisely the same injuries that have been sustained by the class members, only that the harm

complained of be *common* to the class, and that the named plaintiff demonstrate a personal

interest or threat of injury . . . [that] is 'real and immediate,' not 'conjectural' or 'hypothetical.'"

Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988) (internal citations omitted).

     In keeping with the Third Circuit's formulation in Hassine, courts making typicality

analyses have required that class representatives experience the same kinds of harm suffered by

class members.  For example, in General Telephone Co. of the Southwest v. Falcon, the putative

class representative, a General Telephone employee, alleged that the company had failed to

promote him because he was Mexican-American, and sought class certification of all individuals

the company had failed to hire or promote on discriminatory grounds. 457 U.S. 147, 152, 158-59

(1982).  The Supreme Court reversed the decision to certify, holding that the representative's

failure to promote claim was not typical of those class members who were not hired:

> [The employee]'s complaint provided an insufficient basis for concluding that the
> adjudication of his claim of discrimination in promotion would require the
> decision of any common question concerning the failure of [General Telephone]
> to hire more Mexican Americans . . . it was error for the District Court to presume
> that [the employee]'s claim was typical of other claims.

Id. at 158-159.  See also Thompson v. American Chain & Cable Co., 84 F.R.D. 406, 407 (D.

Conn. 1979) (the claims of plaintiff employees were not typical of potential class members who

were denied employment or deterred from seeking employment).

     Applying these typicality criteria here may well compel me to come to different

conclusions respecting plaintiff's job classification and discipline claims.

-14-

### *Discriminatory Job Classification*

Ms. Davis alleges that Kraft discriminated with respect to job classification by: 1) hiring minority employees into the "lowest paid" entry level position of "general help," 2) assigning African-American employees to lower wage grade categories than Caucasian employees, and 3) temporarily assigning non-minority employees to higher wage grades. (Trans. of Sept. 8, 2005 Oral Arg. at 6-8). Collectively, Ms. Davis refers to these allegations as "job classification claims." Id. at 6.

I am compelled to note that Ms. Davis included no job classification claim in her EEOC charges. In these circumstances, I do not believe that her job classification claims could reasonably have been "expected to grow out of the charge of discrimination" in imposing discipline. Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir. 1978). Thus, it appears that Ms. Davis failed to exhaust her administrative remedies with regard to her job classification claims.

Nevertheless, assuming *arguendo* that her job classification claims are not procedurally barred, they do not pass muster under Rule 23(a). Ms. Davis has neither alleged nor shown that she suffered any of the wrongs that make up her job classification claims. Ms. Davis testified that Kraft did not assign her to an entry-level position of "general helper," but rather hired her as a machine operator, a higher-paid position. (Davis Dep. at 35; Pl. Ex. D, 2001-2004 Collect. Barg. Agmt.). In addition, Ms. Davis never sought promotion, nor did she otherwise bid for any other positions. (Davis Dep. at 60-61; 64). The record also does not indicate that Ms. Davis ever sought or was discouraged from seeking a temporary or permanent position with a higher pay grade. In these circumstances, argues Kraft, Plaintiff's claim with respect to job classification is

not "typical" of the proposed class.

Ms. Davis responds that her claims are typical because she was "harmed by working in a segregated and racially stratified workforce, where opportunities are severely limited based upon race." (Pl. Corrected Reply Memo. in Support of Pl. Mot. for Partial Class Cert., p. 16).  In support, she offers her deposition testimony:

> Question: Do you believe that you received lower compensation at the Bakery
> because you are African-American?
> Answer: Yes.

Id. at p. 16 n.11.  Ms. Davis has never explained the basis of this belief.  For instance, she has not alleged that she earned less than Caucasian machine operators.  Nor does Ms. Davis point to any opportunities that she was denied or to any harm or potential injury that she suffered as a result of Kraft's job classification practices.  In these circumstances, Plaintiff has no job classification claim to bring.  Her non-existent "claim" obviously cannot typify those of other class members. See Hassine, 846 F.2d at 177 (noting that the representative plaintiff must demonstrate a "real and immediate" personal interest or threat of injury).

### *Discriminatory Discipline*

In contrast, Ms. Davis's claim that she was a victim of discriminatory discipline may well satisfy the Third Circuit's typicality requirements: her suspension and termination demonstrate a "personal interest or threat of injury . . . [that] is 'real and immediate,' not 'conjectural' or 'hypothetical.'" Hassine, 846 F.2d at 177.  As I explain below, however, I defer judgment on this question.

### B. Adequacy

To certify, I must conclude that "the representative parties will fairly and adequately

protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement has two components: 1) adequacy of class counsel, and 2) adequacy of the class representative.

To meet the adequacy requirement, counsel must have the ability and incentive to represent the class vigorously. In re Cendent Corp. Litig., 264 F.3d 201, 265 (3d Cir. 2001). I may not appoint class counsel whose interests conflict with those of the class. Cf. Walsh v. Great Atl. & Pac. Tea Co., 726 F.2d 956, 964 (3d Cir. 1983) (suggesting circumstances in which class counsel could have conflicts of interest requiring separate representation). In determining adequacy of representation, I "must consider not only actual but also potential conflicts of interest that may arise during the course of litigation of the class claims." Polak v. Noel Indust., Inc., 64 F.R.D. 333, 336 (S.D.N.Y. 1974).

Kraft argues that Davis's counsel, the law firm of Berger & Montague, is inadequate to represent the class because it has a conflict of interest with respect to the disparate discipline claim. Berger & Montague also represents Kraft's former Employee Relations Manager, Sondra Dean, in a separate employment discrimination suit against Kraft currently set for trial on March 13, 2006. Dean v. Kraft Foods North America, Inc., 2:02-cv-8609-WY (E.D. Pa.) (Yohn, J.). Ms. Dean has testified that she was responsible for conducting pre-discipline investigations and, in many instances, disciplining African-American Bakery employees during her employment at Kraft from 1996 to 2002. (Dean I dep., 5/25/04, at p. 211, Ex. H). Ms. Dean emphasized that she performed these disciplinary tasks fairly and without regard to race. (Id.).

Significantly, Ms. Dean was involved in the investigation that led to Plaintiff's suspension, and ultimately concurred in the decision to suspend Ms. Davis. (Dean Dep, 4/20/05, at p. 183-184). In addition, Ms. Dean has testified that once Kelly Wojakowski was appointed as

Human Resources Manager at the Philadelphia Bakery in October 2001, Ms. Dean was responsible for investigating disciplinary incidents involving minorities:

> [The] [w]ay that it broke down is that I ended up getting involved in incidents dealing with minorities, and Kelly was handling all the incidents dealing with whites.

Id. at p. 220-221. Ms. Dean's position also required her to investigate, defend, and resolve disputes regarding disciplinary decisions made through the Union grievance procedure.  (Dean Dep. 5/25/04 at p. 211).  See also Def. Ex. R, Expert Report of Dr. Bernard R. Siskin at 18 (concluding that Dean was the second most frequent discipliner of African-American Bakery employees during the proposed class period).

Kraft contends that Dean's admitted role in disciplining minority employees and her concurrence in the decision to suspend Ms. Davis have put Berger & Montague in an untenable position: if the firm is adequately to represent class members – minorities who allege their discipline was the result of discrimination – then the firm must attack its client, Ms. Dean, who was involved in making those disciplinary decisions.  Similarly, if Berger & Montague is adequately to represent Ms. Davis, it must again attack Ms. Dean, who joined in the decision to suspend Plaintiff without pay for two and a half months.  Kraft thus argues that Berger & Montague's representation of both the proposed class and Ms. Dean creates a conflict of interest under Pennsylvania Rule of Professional Conduct 1.7(b), which provides in pertinent part:

> (b)  A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person . . . unless:
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
> (2) the client consents after full disclosure and consultation.

As the Third Circuit has held, because consent after full disclosure is impossible in class actions,

the district court must protect the class's interests when a potential conflict arises:

> [A]s counsel to parties to the litigation, class action counsel possess, in a very real sense, fiduciary obligations to those not before the court. The ultimate responsibility of course is committed to the district court in whom, as the guardian of the rights of the absentees, is vested broad administrative, as well as adjudicative, power.

Greenfield v. Villager Indus., Inc., 483 F.2d 824, 831-32 (3d Cir. 1973). See also Roger C. Cramton, Symposium: Individualized Justice, Mass Torts, and "Settlement Class Actions": An Introduction, 80 Cornell L. Rev. 811, 834 (May 1995) (stating that "ultimately the consent requirement [in Rule 1.7(b)] must be met by court scrutiny of the situation").

The Berger firm strenuously contends that it is not burdened by a conflict. It offers the opinion of ethics expert Geoffrey Hazard that any consideration of conflict is premature:

> [A]s the evidence now stands, Ms. Dean states that she participated in investigation of facts concerning disciplinary actions of Kraft, but did not participate in decisions concerning discipline itself.

Pl. Letter Brief in Further Support of Class Cert., Ex. C, 12/15/05 Letter from Geoffrey C. Hazard, Jr. at p. 1.

Professor Hazard's reading of the record is simply wrong. There is abundant evidence – much of it from Ms. Dean herself – that Dean participated in the actual decisions to discipline minority employees during the proposed class period. For example, at Ms. Dean's deposition, the following exchange occurred:

> Q: Did you discipline employees when you worked at Kraft – at the Philadelphia bakery both before and after the Kraft acquisition?
> A: That was part of my job, yes.

Dean Dep., 5/25/04, at 211; see also Def. Letter Response to Pl. Letter Brief in Further Support

-19-

of Class Cert., 12/23/05, Ex. J (noting that Ms. Dean suspended African-American hourly

employees in March 2000, August 2000, and August 2002);  Def. Letter Response to Pl. Letter

Brief in Further Support of Class Cert., 12/23/05, Ex. G, Dean Dep., 5/25/04, at 212-213

(acknowledgment by Ms. Dean that she had the authority to make final disciplinary decisions in

certain categories of violations, such as attendance issues).  In these circumstances, I cannot see

how the Berger firm can attack these decisions as racist – which it must do if it is adequately to

represent the proposed class of minority workers – without attacking its client Ms. Dean.  Indeed,

Professor Hazard notes that if there were evidence of Ms. Dean's participation in such discipline

decisions, "the issue of conflict might be reconsidered." (Pl. Letter Brief in Further Support of

Class Cert., Ex. C, 12/15/05 Letter from Geoffrey C. Hazard, Jr. at p. 1).

     Moreover, even under Professor Hazard's inexplicably flawed reading of the record, there

remains a serious potential conflict of interest that could well compromise the Berger firm's

efforts in this case.  If Kraft even partly based its decisions to discipline minority employees on

an investigation Dean conducted, the Berger firm could well be obligated to attack the

investigator as racist.  In these circumstances, only the retention of new counsel could ensure

vigorous class representation.  See Regan Henry Broadcast Group, Inc. v. Hughes, 1992 U.S.

Dist. LEXIS 9718, at *15 (E.D. Pa. June 18, 1992) (the district court has latitude in refusing

waivers of conflicts of interest where the potential for conflict exists (citing Wheat v. United

States, 486 U.S. 153, 163 (1988))).

     To underscore the Berger firm's difficulties, Kraft describes the inconsistent positions the

firm has taken with respect to Ms. Davis's suspension. Kraft notes that in her Complaint –

prepared and filed by the Berger firm – Ms. Davis alleged that her suspension was an example of

Kraft's "discriminatory disciplinary practices," and that the suspension was "unjust." (Compl. §§ 12, 40). Ms. Davis's Memorandum in Support of Class Certification states:

> Based on the fact that . . . Ms. Davis was African-American, Kraft immediately suspended Ms. Davis and two other African-American women . . . . Defendant ignored the fact that a Caucasian employee . . . was in or near the locker room at the time of the alleged attack, and did not suspend or investigate her.

(Pl. Mem. in Support of Class Cert. at 23-24). It is extremely troubling that the Berger firm took exactly the opposite position only *after* Kraft raised the conflict question. At oral argument, when asked to explain how the Berger firm could represent both Ms. Davis and Ms. Dean, Plaintiff's counsel stated, "we're not complaining about the suspension at all." (Trans. of Sept. 8, 2005 Oral Arg. at 28). Rather, Plaintiff's counsel asserted that Ms. Davis was arguing that only her *termination* was discriminatory. The firm has explained that Kraft reinstated Ms. Price and Ms. Dunston with back pay at the conclusion of the Naulty investigation. The Berger firm thus argues that, were it not for the separate incident of alleged harassment for which she was terminated, Ms. Davis would likewise have been reinstated with pay. Thus, the Berger firm argues, the only disciplinary measure that adversely affected Ms. Davis was her termination: "Ms. Davis could not assert a claim for discriminatory suspension because no adverse consequence can be linked to the suspension." (Pl. Surreply Brief, 1/5/06, at p. 2).

I do not understand the firm's explanation of its actions. If Ms. Davis's suspension claim was frivolous, surely the Berger firm would not have included it in her Complaint and class certification memorandum. In fact, the suspension allegations, if true, are quite serious. If Kraft suspended Ms. Davis for racist reasons, she could well be entitled to redress, regardless of whether or not she was reinstated with back pay. See, e.g., Reyes v. City College of the City

-21-

Univ. of N.Y., 2005 U.S. Dist. LEXIS 26953, at *9 (S.D.N.Y. Nov. 4, 2005) (under Title VII, a

suspension, even without a loss of pay, is a materially adverse employment action, given the

likelihood that the suspension could remain in a personnel file or diminish prospects for

promotion) (internal citations omitted); cf. Torre v. Casio, Inc., 42 F.3d 825, 831 n.7 (3d Cir.

1994) (concluding that a transfer, even without loss of pay, may in some circumstances constitute

an adverse job action).  Moreover, conflict-free counsel would undoubtedly point to the allegedly

racist decision to suspend Ms. Davis as powerful evidence in support of the class's racially

disparate discipline claim.  See, e.g., Lusardi v. Lechner, 855 F.2d 1062, 1073 n.13 (3d Cir.

1988) (a pattern of disparate treatment may be established through statistical and anecdotal

evidence of discriminatory intent) (internal citations omitted).  In fact, in its class certification

memorandum, the Berger firm observed that "Plaintiff's individual claim constitutes important

'anecdotal' evidence which supports class claims."  (Pl. Memo. in Support of Partial Class Cert.,

p. 23).  The Berger firm cannot use this anecdotal evidence, however, without attacking its other

client Ms. Dean.

　　　　Equally troubling is the Berger firm's suggestion that the affidavit it has submitted – in

which Ms. Davis states "to the extent that any conflict may exist with respect to my individual

claim, I hereby waive it" – eliminates any conflict or potential conflict.  (Pl. Letter Brief in

Further Support of Class Cert., 12/16/05, Ex. B, Decl. of Debra Davis, at p. 2).  Even assuming

Ms. Davis has knowingly and intelligently waived a conflict on her own behalf, I do not believe

she can waive any conflict on the class's behalf.  See Pa. Rule of Prof'l Conduct 1.7 cmt. (stating

that "when a disinterested lawyer would conclude that the client should not agree to the

representation under the circumstances, the lawyer involved cannot properly ask for such

agreement or provide representation on the basis of the client's consent"); In Re Terazosin

Hydrochloride Antitrust Litigation, 223 F.R.D. 666, (S.D. Fla. 2004) (expressing doubt as to

whether "representative class members can waive any actual or potential conflicts for the

remaining . . . members of the defined proposed class.").

        I am even more troubled by the Berger firm's suggestion that "in the event [its]

representation of [Ms. Dean] jeopardizes the ability for a class to be certified, [Ms. Dean] will

secure alternative counsel to try her case."  (Pl. Letter Brief in Further Support of Class Cert at p.

1-2; id., ex. A, Declaration of Sondra Dean, p. 3).  Ms. Dean's Complaint was filed in 2002;

Judge Yohn has scheduled trial for March 2006.  The Berger firm cannot withdraw from the

Dean case without Judge Yohn's permission.  See Local Rule 5.1(c).  Moreover, the Berger

firm's unseemly suggestion that, having represented Ms. Dean for some four years, it can

abandon her two months before trial, is contrary to any semblance of client loyalty.  See In re

Corn Derivatives Antitrust Litig., 748 F.2d 157, 162 (3d Cir. 2000) (stating, "[a] client has a right

to expect the loyalty of his attorney in the matter for which he is retained."); Pa. Rule of Prof'l

Conduct 1.7 cmt. ("Loyalty is an essential element in the lawyer's relationship to the client.").

        Finally, the Berger firm's proffered withdrawal from the Dean case would appear

to violate the so-called "hot potato rule," under which a lawyer "may not drop one client like a

'hot potato' in order to avoid a conflict with another, more remunerative client."  International

Longshoremen's Ass'n, Local Union 1332 v. International Longshoremen's Ass'n, 909 F. Supp.

287, 293 (E.D. Pa. 1995).  See also Pyle v. Meritor Savings Bank, 1993 WL 483196, at *2 n.2

(E.D. Pa. Nov. 23, 1993) (law firm may not undertake representation of two potentially adverse

clients and then, when a conflict arises, choose between the clients); Santacroce v. Neff, 134 F.

Supp. 2d 366, 370-71 (D.N.J. 2001) (applying "hot potato" rule to preclude law firm from dropping one client to avoid conflict with another client).

In sum, representing Sondra Dean, Debra Davis, and the proposed class would unquestionably place the Berger firm in an untenable position. The firm's arguments against the finding of a conflict, and its actions to evade the conflict, only underscore the need for new counsel in this case. Accordingly, I conclude that Ms. Davis presently is not an adequate class representative as to the disciplinary claims. I will deny certification as to these claims without prejudice, pending Plaintiff's retention of replacement counsel.

### C. Other Class Certification Criteria

Kraft vigorously argues that Ms. Davis's disparate discipline claims do not pass muster under the remaining Rule 23 requirements. In light of my ruling respecting adequacy, I will defer making any decision on this question until Plaintiff obtains new counsel.

## IV. Expert Report

Kraft has moved to strike the Report of Ms. Davis's expert, Dr. David Crawford, arguing that it does not comport with Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). As I stated at oral argument, the contention is premature. See Trans. of Sept. 8, 2005 Oral Arg. at 42; In re Visa Check/Mastercard Antitrust Litig., 280 F.3d 124, 135 (2d Cir. 2001) (a court on class certification is limited to determining whether an expert report is "not so flawed that it would be inadmissible as a matter of law"); Nichols v. Smithkline Beecham Corp., 2003 WL 302352 (E.D. Pa. Jan. 29, 2003) ("At [the class certification] stage of the proceeding the Court does not consider whether an expert witness's opinion would be admissible pursuant to Daubert . . . ."). Accordingly, I deny the Motion without prejudice to the

extent that it relates to Plaintiff's claim of disparate discipline. I deny the Motion as moot to the extent that it relates to those portions of Dr. Crawford's report dealing with Plaintiff's "job classification" claims.

An appropriate Order follows.

BY THE COURT:

*/s Paul S. Diamond, J.*

_____

Paul S. Diamond, J.